IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 16- |
| v. | : | DATE FILED: February 4, 2016 |
| MARC ROY FERRY | : | VIOLATIONS: 18 U.S.C. §§ 1343, 1349, 2326(2)(A) & (B) |
| | : | (wire fraud – 1 count) 18 U.S.C. § 1956(a)(2) |
| | : | (money laundering – 2 counts) Notice of Sentencing Enhancement |
| | : | Notice of Forfeiture |

## INFORMATION

## COUNT ONE

THE UNITED STATES ATTORNEY CHARGES THAT:

At all times material to this indictment:

### Background

1. Ari Tietolman, charged elsewhere, was a Canadian citizen living in Québec, Canada.

2. Stephane Scebba, charged elsewhere, was a Canadian citizen living in Québec, Canada.

3. A.H. was a Canadian citizen living in Québec, Canada.

4. S.R. was a Canadian citizen living in Québec, Canada.

5. A.I. was a Canadian citizen living in Québec, Canada.

6. Defendant MARC ROY FERRY was a United States citizen living in Chester County, Pennsylvania.

7.  L.F. was a United States citizen living in Florida and Chester County, Pennsylvania.

8.  Standard American Marketing, Inc. ("Standard American Marketing") was a Delaware corporation with its principal place of business listed as Phoenix, Arizona.

9.  Secure Account Services, LLC ("Secure Account Services") was a Florida limited liability company with its principal place of business listed as Tampa, Florida and Downingtown, Pennsylvania.

10. First Consumers, LLC ("First Consumers") was a Pennsylvania limited liability company with its principal place of business listed as Downingtown, Pennsylvania. First Consumers also did business as Fraud Watch, Patient Assistance Plus, and Legal Eye.

11. PowerPlays LLC ("PowerPlays") was a Pennsylvania limited liability company with its principal place of business listed as Exton, Pennsylvania.

12. TrustOne was an Arizona corporation with its principal place of business listed as Phoenix, Arizona and Downingtown, Pennsylvania.

13. Madicom Inc. ("Madicom") was a Canadian corporation owned by Ari Tietolman.

14. Landshark Holdings, Inc. ("Landshark") was a Canadian corporation owned by Ari Tietolman.

## THE SCHEME

15. From at least about 2009 to in or about March 2014, in the Eastern District of Pennsylvania and elsewhere, defendant

**MARC ROY FERRY,**

together and with Ari Tietolman, charged elsewhere, and others known and unknown to the

United States Attorney, devised and intended to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises.

## MANNER AND MEANS

It was part of the scheme that:

16. Ari Tietolman used a network of telemarketers to target American seniors with deceptive telemarketing calls, selling worthless or non-existent products and services, and then had his organization debit seniors' bank accounts without their informed consent.

### The Fraud Companies

17. Ari Tietolman created, or had created, a number of fraudulent companies ("the fraud companies"), including but not limited to:

   a. Standard American Marketing, which also did business as Secure Account Services, and sold a purported fraud protection service; and

   b. First Consumers, which also did business as Fraud Watch, Patient Assistance Plus, Legal Eye and Trust One, and which sold a purported fraud protection service, a purported prescription drug discount card, and a purported discounted legal service;

18. The products and services offered by the fraud companies were worthless or non-existent. For example:

   a. The victims who were convinced to buy the fraud protection service from Fraud Watch, received no such service.

   b. The victims who were convinced to buy the discount prescription product from Patient Assistance Plus or TrustOne received a prescription drug discount card along with a list of participating pharmacies that purportedly accepted the cards. A.I. supervised the shipping of purported prescription drug discount cards to victims. However, these cards were

available to consumers, free of charge, on public websites, and these cards typically provided no discount benefits to people insured by Medicare or private insurance companies. Most of the victims of this scheme were senior citizens and thus insured by Medicare.

  c. The victims who were convinced to buy the legal services product from Legal Eye received no service.

### The Telemarketing Scheme

  19. Ari Tietolman, Stephane Scebba, and others obtained names and telephone numbers of elderly Americans.

  20. Ari Tietolman, Stephane Scebba, and A.H. hired and instructed telemarketers outside the United States to call these elderly Americans to sell the worthless or non-existent products and services offered by these companies. A.H. supervised many telemarketers who were based in "boiler rooms" in and around Québec, Canada.

  21. During these calls, Ari Tietolman's telemarketers made various false representations, such as they were calling on behalf of, or are affiliated with, the victim's bank, or insurance company, or the United States government.

  22. During these calls, Ari Tietolman's telemarketers described the products marketed by the fraud companies, and often misled the consumers about the need for these products and services. For example:

  a. When selling the product offered by Fraud Watch, the telemarketers often claimed that consumers must sign up, or renew, their fraud protection service immediately to preserve their protection against the threat of bank fraud. However, the fraud companies offered no real fraud protection and Fraud Watch did nothing to help prevent fraud.

  b. When selling the product offered by Patient Assistance Plus or

4

TrustOne, the telemarketers often claimed that this service provided consumers substantial discounts on prescription drugs and that Patient Assistance Plus or TrustOne "worked directly" with the drug manufacturers. However, Patient Assistance Plus and TrustOne had no relationship with drug companies and the benefits they claimed to sell were worthless.

23. In addition to misrepresenting the value of the products being marketed, Ari Tietolman's telemarketers also misrepresented the cost of these products, sometimes telling consumers the products were free, or less expensive than the amount that was ultimately debited from the consumers' bank accounts.

24. In other instances, Ari Tietolman's telemarketers assured consumers they would not debit the consumers' bank accounts and then did just that after the consumer provided their bank account information.

**FERRY and Others Helped Conceal Tietolman's Involvement in the Fraud**

25. Ari Tietolman attempted to conceal his involvement in the scheme by employing defendant MARC ROY FERRY and others to run "front" companies, including First Consumers, and process the fraud money.

26. Ari Tietolman paid defendant MARC ROY FERRY and others to form corporations in the United States. The sole purpose of these corporations was to process the fraud proceeds generated by the telemarketing scheme. Tietolman instructed defendant FERRY and others to open up numerous bank accounts in the United States in the names of the fraud companies that they had incorporated. Defendant FERRY sent Tietolman, A.H., and S.R. online logins and passwords so Tietolman, A.H., S.R., and others could control these United States bank accounts from Canada. Defendant FERRY also sent a stamp of his signature to Tietolman so Tietolman and others could issue paper checks on these United States accounts from Canada.

5

27. Ari Tietolman sent, or had others send, defendant MARC ROY FERRY and others bank account information for the victims in the United States. Using computer programs and printers provided by Tietolman, defendant FERRY and others used the victims' bank account information to print remotely created checks ("RCCs"), in the United States. The RCCs were all made payable to the fraud companies and did not require a signature by the account holder. Because these RCCs did not require the account holder's consent each time a check was created and submitted to the bank for payment, the account holder-victim had no opportunity to object or prevent the debit from occurring.

28. Defendant MARC ROY FERRY and others deposited the RCCs in bank accounts held by the fraud companies, per Tietolman's instructions.

29. Ari Tietolman instructed defendant MARC ROY FERRY and others to deposit the RCCs in batches of less than $10,000 to avoid federally-mandated reporting requirements. After the checks were deposited, Tietolman and A.H. instructed defendant FERRY and others to wire the majority of the funds to accounts in Canada in the names of Madicom, Landshark, and other fraud companies.

**Tietolman, FERRY, and Others Used American Banks to Perpetuate the Scheme**

30. Ari Tietolman, Stephane Scebba, A.H., defendant MARC ROY FERRY, A.I., and others knew that many victims would notice unauthorized debits from their account and complain to the fraud companies or the victims' banks. In some cases, A.I. and others at the fraud companies would process refunds for the victims. In other cases, the victim's bank would reverse the debit and return the RCC to defendant FERRY and others and designate the returned check as "unauthorized," or something similar. Indeed, from 2011 on, there were more than $8 million in returned RCCs.

31. Ari Tietolman, Stephane Scebba, A.H., defendant MARC ROY FERRY, and others knew that many banks were suspicious of businesses like the fraud companies that used RCCs and generated a large number of returned checks. In addition, Tietolman, Scebba, A.H., and defendant FERRY knew that many banks would close accounts of such businesses because of concerns they were engaged in fraudulent or criminal activity.

32. To ensure that his telemarketing scheme had banks in which to deposit the RCCs, Ari Tietolman, A.H., S.R., and others instructed defendant MARC ROY FERRY, L.F., and others to simultaneously open accounts at several banks in the United States for the fraud companies. Accordingly, the fraud companies still had accounts to deposit the fraud proceeds even if one or more banks froze and/or closed their accounts.

33. Per Ari Tietolman's instructions, defendant MARC ROY FERRY recruited others to open bank accounts in in California, Georgia, and North Carolina to deposit victims' checks. These accounts were opened in the name of PowerPlays.

### Tietolman Took Steps to Avoid Law Enforcement

34. In or about June 2009, the state of Kansas sued L.F. and Secure Account Services, alleging that L.F. and Secure Account Services had engaged in telemarketing fraud, using tactics similar to the allegations in this indictment.

35. In or about September 2009, Ari Tietolman's attorney negotiated a settlement on behalf of L.F. and Secure Account Services with the State of Kansas, whereby they agreed to pay a fine and refrain from engaging in deceptive telemarketing in the State of Kansas.

36. Following the Kansas lawsuit, Ari Tietolman instructed his telemarketers not to call people in Kansas and other states where law enforcement and regulators had pursued litigation against Tietolman, L.F., defendant MARC ROY FERRY, the fraud companies, and/or

others. Defendant FERRY sent new complaints from states to the fraud companies in Canada, where A.I. handled them per Tietolman's instructions.

## Scope of the Fraud

37. While Ari Tietolman has operated this scheme since at least 2005, since May 2011, Tietolman, Stephane Scebba, A.H., defendant MARC ROY FERRY, and others have used this scheme to take more than $13 million from tens of thousands of senior Americans.

38. On or about the date set forth below, in the Eastern District of Pennsylvania, and elsewhere, defendant

**MARC ROY FERRY,**

for the purpose of executing the scheme described above, and attempting to do so, and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| ONE | November 28, 2012 | A $9,000 bank wire from First Consumers' bank account ending in 1394 at Susquehanna Bank in the Eastern District of Pennsylvania to Madicom's bank account at Jameson Bank in Canada. |

All in violation of Title 18, United States Code, Sections 1343, 1349, and 2326(2)(A) & (B).

## COUNTS TWO AND THREE

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

1. Paragraphs 1-14 and 16-37 of Count One are incorporated here.

2. Ari Tietolman paid defendant MARC ROY FERRY to open bank accounts in Pennsylvania in the name of the fraud companies to deposit fraud proceeds from the telemarketing scheme described in Count One.

3. Ari Tietolman instructed defendant MARC ROY FERRY to deposit the fraud proceeds in the fraud companies' bank accounts in amounts less than $10,000 to avoid federally-mandated reporting requirements.

4. Ari Tietolman instructed defendant MARC ROY FERRY to wire the fraud proceeds from the fraud companies' bank accounts in the United States to bank accounts he controlled in Canada, in amounts less than $10,000 to avoid federally-mandated reporting requirements.

5. Between January 2011 and March 2014, defendant MARC ROY FERRY sent, by electronic wire or check, approximately $4.3 million from the First Consumers' account at Susquehanna Bank to bank accounts controlled by Ari Tietolman in Canada.

6. On or about the date set forth below, in the Eastern District of Pennsylvania, and elsewhere, defendant

**MARC ROY FERRY**

knowingly conducted, and attempted to conduct, and willfully caused, the following financial transactions affecting interstate commerce:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| TWO | May 1, 2013 | A $9,800 bank wire from First Consumers' bank account ending in 1394 at Susquehanna Bank in the Eastern District of Pennsylvania to Landshark's bank account in Canada. |
| THREE | May 2, 2013 | A $9,897.57 bank wire from First Consumers' bank account ending in 1394 at Susquehanna Bank in the Eastern District of Pennsylvania to Landshark's bank account in Canada. |

7. When conducting and willfully causing, the financial transactions described in paragraph 6 above, defendant MARC ROY FERRY knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

8. The financial transactions described in paragraph 6 above involved the proceeds of a specified unlawful activity, that is, wire fraud, in violation of 18 U.S.C. § 1343, and defendant MARC ROY FERRY acted with the knowledge that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity.

9. The financial transactions described in paragraph 6 above involved the proceeds of a specified unlawful activity, that is, wire fraud, in violation of 18 U.S.C. § 1343, and defendant MARC ROY FERRY acted with the knowledge that the transactions were designed, in whole and in part to avoid a transaction reporting requirement under state or federal law.

All in violation of Title 18, United States Code, Sections 1956(a)(2)(B)(i), (B)(ii).

## NOTICE OF SENTENCING ENHANCEMENT

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

1. Paragraphs 1-14 and 16-37 of Count One are incorporated here.

2. From at least about 2009 to in or about March 2014, in the Eastern District of Pennsylvania and elsewhere, defendant

### MARC ROY FERRY,

together and with Ari Tietolman, charged elsewhere, and others known and unknown to the United States Attorney, devised and intended to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises, in violation of Title 18, United States Code, Sections 1343 and 1349, in connection with the conduct of telemarketing that victimized ten or more persons over the age of 55 and targeted persons over the age of 55.

All in violation of Title 18, United States Code, Section 2326(2)(A) & (B).

## NOTICE OF FORFEITURE

THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:

1. As a result of the violations of Title 18, United States Code, Sections 1343, 1349, 1956, and 2326, set forth in this indictment, defendant

## MARC ROY FERRY

shall forfeit to the United States of America any property, real or personal, used or intended to be used to commit, facilitate, or to promote the commission of such offense; and constituting, derived from, or traceable to the gross proceeds that the defendant obtained directly or indirectly as a result of the offense.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   (a) cannot be located upon the exercise of due diligence;

   (b) has been transferred or sold to, or deposited with, a third party;

   (c) has been placed beyond the jurisdiction of the Court;

   (d) has been substantially diminished in value; or

   (e) has been commingled with other property which cannot be divided without difficulty

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982.

_____
ZANE DAVID MEMEGER
UNITED STATES ATTORNEY